# EXHIBIT A – 9 Pages

1. The 1778 Delawares Treaty of Perpetual Peace and Friendship.
2. The 1863 Pembina Nation Treaty of Perpetual of Peace and Friendship.
3. The 1787 Moorish Treaty of Perpetual Peace and Friendship.



# Marks in Time:
# Delaware Treaty History

# Treaty of 1778, America's First Indian Treaty

In 1778, when the newly-declared United States was only a spit in King George's eye, the United States signed what would become its first Indian Treaty. Scrapping for its life, having barely hung on through the horrible winter of Valley Forge, the new country's leaders sought to create allies on the land for which they were fighting. At that time, the Delawares were often referred to as "Grandfather" or "the Grandfather tribe" by other Indians because of the respected Delaware diplomatic skills, and their reliable honesty and honor in dealing with often-warring factions.. Themselves fierce warriors when aroused, the Delawares believed in signing this treaty that the immigrants were dealing with them responsibly and honorably, and were acting as a new nation forging a treaty with an already-established, and ancient nation, that of the Delawares (Lenapes).

TREATY WITH THE DELAWARES 1778<br>Sept. 17 1778 , 7 Stat., 13. [3]

Articles of agreement and confederation, made and entered into by Andrew and Thomas Lewis, Esquires, Commissioners for, and in Behalf of the <u>United States of North-America of the one Part</u>, and Capt. White Eyes, Capt. John Kill Buck, Junior, and Capt. Pipe, Deputies and Chief Men of the <u>Delaware Nation of the other Part</u>.

ARTICLE 1. That all offences or acts of hostilities by one, or either of the contracting parties against the other, be mutually forgiven, and buried in the depth of oblivion, never more to be had in remembrance.

ARTICLE 2. <u>That a perpetual peace and friendship shall from henceforth take place, and subsist between the contracting parties aforesaid, through all succeeding generations</u>: and if either of the parties are engaged in a just and necessary war with any other nation or nations, that then each shall assist the other in due proportion to their abilities, till their enemies are brought to reasonable terms of accommodation: and that if either of them shall discover any hostile designs forming against the other, they shall give the earliest notice thereof that timeous measures may be taken to prevent their ill effect.

06 1372

FILED
AUG - 1 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

ARTICLE 3. And whereas the United States are engaged in a just and necessary war, in defence and support of life, liberty and independence, against the King of England and his adherents, and as said King is yet possessed of several posts and forts on the lakes and other places, the reduction of which is of great importance to the peace and security of the contracting parties, and as the most practicable way for the troops of the United States to some of the posts and forts is by passing through the country of the Delaware nation, the aforesaid deputies, on behalf of themselves and their nation, do hereby stipulate and agree to give a free passage through their country to the troops aforesaid, and the same to conduct by the nearest and best ways to the posts, forts or towns of the enemies of the United States, affording to said troops such supplies of corn, meat, horses, or whatever may be in their power for the accommodation of such troops, on the commanding officer's, &c. paying, or engaging to pay, the full value of whatever they can supply them with. And the said deputies, on the behalf of their nation, engage to Join the troops of the United States aforesaid, with such a number of their best and most expert warriors as they can spare, consistent with their own safety, and act in concert with them; and for the better security of the old men, women and children of the aforesaid nation, whilst their warriors are engaged against the common enemy, it is agreed on the part of the United States, that a fort Of [4] sufficient strength and capacity be built at the expense of the said States, with such assistance as it may be in the power of the said Delaware Nation to give, in the most convenient place, and advantageous situation, as shall be agreed on by the commanding officer of the troops aforesaid, with the advice and concurrence of the deputies of the aforesaid Delaware Nation, which fort shall be garrisoned by such a number of the troops of the United States, as the commanding officer can spare for the present, and hereafter by such numbers, as the wise men of the United States in council, shall think most conducive to the common good. <u>For the better security of the peace and friendship now entered into by the contracting parties, against all infractions of the same by the citizens of either party, to the prejudice of the other, neither party shall proceed to the infliction of punishments on the citizens of the other, otherwise than by securing the offender or offenders by imprisonment, or any other competent means, till a fair and impartial trial can be had by judges or juries of both parties, as near as can be to the laws, customs and usages of the contract parties and natural justice:</u> The mode of such trials to be hereafter fixed by the wise men of the United States in Congress assembled, with the assistance of such deputies of the Delaware nation, as may be appointed to act in concert with them in adjusting this matter to their mutual liking. And it is further agreed between the parties aforesaid, that neither shall entertain or give countenance to the enemies of the other, or protect in their respective states, criminal fugitives, servants or slaves, but the same to apprehend, and secure and deliver to the State or States, to which such enemies, criminals, servants or slaves respectively belong.

ARTICLE 5. Whereas the confederation entered into by the Delaware nation and the United States, renders the first dependent on the latter for all the articles of clothing, utensils and implements of war, and it is judged not only reasonable, but indispensably necessary, that the aforesaid Nation be supplied with such articles from time to time, as far as the United States may have it in their power, by a well-regulated trade, under the conduct of an intelligent, candid agent, with an adequate salary, one more influenced by the love of his country, and a constant attention to the duties of his department by promoting the common interest, than the sinister purposes of

converting and binding all the duties of his office to his private emolument: Convinced of the necessity of such measures, the Commissioners of the United States, at the earnest solicitation of the deputies aforesaid, have engaged in behalf of the United States, that such a trade shall be afforded said nation, conducted on such principles of mutual interest as the wisdom of the United States in Congress assembled shall think most conducive to adopt for their mutual convenience.

ARTICLE 6. Whereas the enemies of the United States have endeavored, by every artifice in their power, to possess the Indians in general with an opinion, that it is the design of the States aforesaid, to extirpate the Indians and take possession of their country: to obviate such false suggestion, <u>the United States do engage to guarantee to the aforesaid nation of Delawares, and their heirs, all their territorial rights in the fullest</u> and most ample manner, as it hath been bounded by former treaties, as long as they the said Delaware nation shall abide by, and hold fast the chain [5] of friendship now entered into. And it is further agreed on between the contracting parties should it for the future be found conducive for the mutual interest of both parties to invite any other tribes who have been friends to the interest of the United States, to Join the present confederation, and **to form a state whereof the Delaware nation shall be the head**, and have a representation in Congress: Provided, nothing contained in this article to be considered as conclusive until it meets with the approbation of Congress. And it is also the intent and meaning of this article, that no protection or countenance shall be afforded to any who are at present our enemies, by which they might escape the punishment they deserve.

In witness whereof, the parties have hereunto interchangeably set their hands and seals, at Fort Pitt, September seventeenth, anno Domini one thousand seven hundred and seventy-eight.

Andrew Lewis
Thomas Lewis
White Eyes, his x mark
The Pipe, his x markkJohn Kill Buck, his x mark
In presence of
Lach'n McIntosh, brigadier-general, commander the Western Department.
Daniel Brodhead, colonel Eighth Pennsylvania Regiment,
W. Crawford, colonel,
John Campbell,
John Stephenson,
John Gibson, colonel Thirteenth Virginia Regiment,
A. Graham, brigade major,
Lach. McIntosh, jr., major brigade,
Benjamin Mills,
Joseph L. Finley, captain Eighth Pennsylvania Regiment,
John Finley, captain Eighth Pennsylvania Regiment.




# Shell Pembina Band of North America and 1863 Treaty

## TREATY WITH THE CHIPPEWA—RED LAKE AND PEMBINA BANDS, 1863

Oct. 2, 1863.| 13 Stats., 667.| Ratified Mar. 1, 1864.| Proclaimed May 5, 1864.

*Indian Affairs: Laws and Treaties.* Vol. II (Treaties).
Compiled and edited by Charles J. Kappler. Washington: Government Printing Office, 1904.

---

Vol. II, Pages 853-855 | Page 854 | Page 855

---

**Margin Notes:**

Claims, how to be audited      Appropriation for former depredations

*Articles of a treaty made and concluded at the Old Crossing of Red Lake River, in the State of Minnesota, on the second day of October, in the year eighteen hundred and sixty-three, between the United States of America, by their commissioners, Alexander Ramsey and Ashley C. Morrill, agent for the Chippewa Indians, and the Red Lake and Pembina bands of Chippewas; by their chiefs, head-men, and warriors.*

**ARTICLE 1.**   Perpetual peace and friendship.

The peace and friendship now existing between the United States and the Red Lake and Pembina bands of Chippewa Indians shall be perpetual.

**ARTICLE 2.**   Lands ceded to the United States.

The said Red Lake and Pembina bands of Chippewa Indians do hereby cede, sell, and convey to the United States all their right, title, and interest in and to all the lands now owned and claimed by them in the State of Minnesota and in the Territory of Dakota within the following descr ibed boundaries, to wit: Beginning at the point where the international boundary between the United States and the British possessions intersects the shore of the Lake of the Woods; thence in a direct line southwesterly to the head of Thief River; thence down the main channel of said Thief River to its mouth on the Red Lake River; thence in a southeasterly direction, in a direct line toward the head of Wild Rice River, to the point where such line would intersect the northwestern boundary of a tract ceded to the United States by a treaty concluded at Washington on the 22d day of February, in the year eighteen hundred and fifty-five, with the Mississippi, Pillager, and Lake Winnebigoshish bands of Chippewa Indians; thence along the said boundary-line of the said cession to the mouth of Wild Rice River; thence up the main channel of the Red River to the mouth of the Shayenne; thence up the main channel of the Shayenne River to Poplar Grove; thence in a direct line to the Place of Stumps, otherwise called Lake Chicot; thence in a direct line to the head of the main branch of Salt River; thence in a direct line due north to the point where such line would intersect the international boundary aforesaid; thence eastwardly along said boundary to the place of beginning.

**ARTICLE 3.**   Boundaries   For road from Leach Lake to Red Lake

In consideration of the foregoing cession, the United States agree to pay to the said Red Lake and Pembina bands of Chippewa Indians the following sums, to wit: Twenty thousand dollars per annum for twenty years; the said sum to be distributed among the [*854] Chippewa Indians of the said bands in equal amounts per capita, and for this purpose an accurate enumeration and enrollment of the members of the respective bands and families shall be made by the officers of the United States: *Provided*, That so much of this sum as the President of the United States shall direct, not exceeding five thousand dollars per year, may be reserved from the above sum, and applied to agriculture, education, the purchase of goods, powder, lead, &c., for their use, and to such other beneficial purposes, calculated to promote the prosperity and happiness of the said Chippewa Indians, as he may prescribe.

**ARTICLE 4.**    Amnesty for past offenses  Payment for lands ceded    Appropriation for powder, lead, etc.

And in further consideration of the foregoing cession, and of their promise to abstain from such acts in future, the United States agree that the said Red Lake and Pembina bands of Chippewa Indians shall not be held liable to punishment for past offences. And in order to make compensation to the injured parties for the depredations committed by the said Indians on the goods of certain British and American traders at the mouth of Red Lake River, and for exactions forcibly levied by them on the proprietors of the steamboat plying on the Red River, and to enable them to pay their just debts, the United States agree to appropriate the sum of one hundred thousand dollars, it being understood and agreed that the claims of individuals for damages or debt under this article shall be ascertained and audited, in consultation with the chiefs of said bands, by a commissioner or commissioners appointed by the President of the United States; furthermore, the sum of two thousand dollars shall be expended for powder, lead, twine, or such other beneficial purposes as the chiefs may request, to be equitably distributed among the said bands at the first payment: *Provided*, That no part of the sum of one hundred thousand dollars shall be appropriated or paid to make compensation for damages or for the payment of any debts owing from said Indians until the said commissioner or commissioners shall report each case, with the proofs thereof, to the Secretary of the Interior, to be submitted to Congress, with his opinion thereon, for its action; and that, after such damages and debts shall have been paid, the residue of said sum shall be added to the annuity funds of said Indians, to be divided equally upon said annuities.

**ARTICLE 5.**    Proviso

To encourage and aid the chiefs of said bands in preserving order and inducing, by their example and advice, the members of their respective bands to adopt the habits and pursuits of civilized life, there shall be paid to each of the said chiefs annually, out of the annuities of the said bands, a sum not exceeding one hundred and fifty dollars, to be determined by their agents according to their respective merits. And for the better promotion of the above objects, a further sum of five hundred dollars shall be paid at the first payment to each of the said chiefs to enable him to build for himself a house. Also, the sum of five thousand dollars shall be appropriated by the United States for cutting out a road from Leach Lake to Red Lake.

**ARTICLE 6.**    Board of visitors their appointment; duty, pay

The President shall appoint a board of visitors, to consist of not less than two nor more than three persons, to be selected from such Christian denominations as he may designate, whose duty it shall be to attend at all annuity payments of the said Chippewa Indians, to inspect their field and other improvements, and to report annually thereon on or before the first day of November, and also as to the qualifications and moral deportment of all persons residing upon the reservation under the authority of law; and they shall receive for their services five dollars a day for the time actually employed, and ten cents per mile for travelling expenses: *Provided*, That no one shall be paid in any one year for more than twenty days' service or for more than three hundred miles' travel.

**ARTICLE 7.**    Spirituous liquors prohibited

The laws of the United States now in force, or that may hereafter be enacted, prohibiting the introduction and sale of spirituous
[*855] liquors in the Indian country, shall be in full force and effect throughout the country hereby ceded, until otherwise directed by Congress or the President of the United States.

**ARTICLE 8.**    Appropriation to encourage the adoption of habits of civilized life. Grant of 160 acres of land to certain of these Indians

In further consideration of the foregoing cession, it is hereby agreed that the United States shall grant to each male adult half-breed or mixed-blood who is related by blood to the said Chippewas of the said Red Lake or Pembina bands who has adopted the habits and customs of civilized life, and who is a citizen of the United States, a homestead of one hundred and sixty acres of land, to be selected at his option, within the limits of the tract of country hereby ceded to the United States, on any land not previously occupied by actual settlers or covered by prior grants, the boundaries thereof to be adjusted in conformity with the lines of the official surveys when the same shall be made, and with the laws and regulations of the United States affecting the location and entry of the same: *Provided*, That no scrip shall be issued under the provisions of this article, and no assignments shall be made of any right, title, or interest at law or in equity until a patent shall issue, and no patent shall be issued until due proof of five years' actual residence and cultivation, as required by the act entitled "An act to secure homesteads on the public domain."

**ARTICLE 9.**   Reservations of 640 acres each for the chiefs Moose Dung and Red Bear

Upon the urgent request of the Indians, parties to this treaty, there shall be set apart from the tract hereby ceded a reservation of (640) six hundred and forty acres near the mouth of Thief River for the chief "Moose Dung," and a like reservation of (640) six hundred and forty acres for the chief "Red Bear," on the north side of Pembina River.

In witness whereof, the said Alexander Ramsey and Ashley C. Morrill, commissioners on the part of the United States, and the chiefs, headmen, and warriors of the Red Lake and Pembina bands of Chippewa Indians, have hereunto set their hands, at the Old Crossing of Red Lake River, in the State of Minnesota, this second day of October, in the year of our Lord one thousand eight hundred and sixty-three.

Alex. Ramsey, Ashley C. Morrill, Commissioners.
Mons-o-mo, his x mark, Moose Dung, Chief of Red Lake.
Kaw-wash-ke-ne-kay, his x mark, Crooked Arm, Chief of Red Lake.
Ase-e-ne-wub, his x mark, Little Rock, Chief of Red Lak(e).
Mis-co-muk-quoh, his x mark, Red Bear, Chief of Pembina.
Ase-anse, his x mark, Little Shell, Chief of Pembina.
Mis-co-co-noy-a, his x mark, Red Rob, Warrior of Red Lake.
Ka-che-un-ish-e-naw-bay, his x mark, The Big Indian, Warrior of Red Lake.
Neo-ki-zhick, his x mark, Four Skies, Warrior of Red Lake.
Nebene-quin-gwa-hawegaw, his x mark, Summer Wolverine, Warrior of Pembina.
Joseph Gornon, his x mark, Warrior of Pembina.
Joseph Montreuil, his x mark, Warrior of Pembina.
Teb-ish-ke-ke-shig, his x mark, Warrior of Pembina.
May-shue-e-yaush, his x mark, Dropping Wind, Head Warrior of Red Lake.
Min-du-wah-wing, his x mark, Berry Hunter, Warrior of Red Lake.
Naw-gaun-e-gwan-abe, his x mark, Leading Feather, Chief of Red Lake.

Signed in presence of—
Paul H. Beaulieu, special interpreter.
Peter Roy,

T. A. Warren, United States interpreter.
J. A. Wheelock, secretary.
Reuben Ottman, secretary.
George A. Camp, major Eighth Regiment Minnesota Volunteers.
William T. Rockwood, Captain Company K, Eighth Regiment Minnesota Volunteers.
P. B. Davy, Captain Company L, First Regiment Minnesota Mounted Rangers.
G. M. Dwelle, Second Lieutenant Third Minnesota Battery.
F. Rieger, Surgeon Eighth Regiment Minnesota Volunteers.
L. S. Kidder, First Lieutenant Company L, First Minnesota Mounted Rangers.
Sam. B. Abbe.
C. A. Kuffer.
Pierre x Bottineau.

-------------------------------------------------------
--------
Vol. II, Pages 853-855 | Page 854 | Page 855 | Top of Treaty
-------------------------------------------------------
--------
OSU Library Digitization Center

Produced by the Oklahoma State University Library
Generous support provided by The Coca-Cola Foundation, Atlanta, GA
URL: http://digital.library.okstate.edu/kappler/
Comments to: lib-dig@okstate.edu

# The Moorish-American Treaty of Peace & Friendship
## Certified Translation of the Treaty, with Approval by Jefferson and Adams

To all Persons to whom these Presents shall come or be made known:

Whereas the United States of America in Congress assembled by their Commission bearing date the twelfth day of May One thousand Seven hundred and Eighty four thought proper to constitute John Adams, Benjamin Franklin and Thomas Jefferson their Ministers Plenipotentiary, giving to them or a Majority of them full Powers to confer, treat & negotiate with the Ambassador, Minister or Commissioner of His Majesty the Emperor of Morocco concerning a Treaty of Amity and Commerce, to make & receive propositions for such Treaty and to conclude and sign the same, transmitting it to the United States in Congress assembled for their final Ratification, And by one other (commission bearing date the Eleventh day of March One thousand Seven hundred & Eighty five did further empower the said Ministers Plenipotentiary or a majority of them, by writing under the* hands and Seals to appoint such Agent in the said Business as they might think proper with Authority under the directions and Instructions of the said Ministers to commence & prosecute the said Negotiations & Conferences for the said Treaty provided that the said Treaty should be signed by the said Ministers:

And Whereas, We the said John Adams & Thomas Jefferson two of the said Ministers Plenipotentiary (the said Benjamin Franklin being absent) by writing under the Hand and Seal of the said John Adams at London October the fifth, One thousand Seven hundred and Eighty five, & of the said Thomas Jefferson at Paris October the Eleventh of the same Year, did appoint Thomas Barclay, Agent in the Business aforesaid, giving him the Powers therein, which by the said second Commission we were authorized to give, and the said Thomas Barclay in pursuance thereof, hath arranged Articles for a Treaty of Amity and Commerce between the United States of America and His Majesty the Emperor of Morocco, which Articles written in the Arabic Language, confirmed by His said Majesty the Emperor of Morocco & seal with His Royal Seal, being translated into the Language of the said United States of America, together with the Attestations thereto annexed are in the following Words, To Wit.

In the name of Almighty God,

This is a Treaty of Peace and Friendship established between us and the United States of America, which is confirmed, and which we have ordered to be written in this Book and sealed with our Royal Seal at our Court of Morocco on the twenty fifth day of the blessed Month of Shaban, in the Year One thousand two hundred, trusting in God it will remain permanent.

1.
We declare that both Parties have agreed that this Treaty consisting of twenty five Articles shall be inserted in this Book and delivered to the Honorable Thomas Barclay, the Agent of the United States now at our Court, with whose Approbation it has been made and who is duly authorized on their Part, to treat with us concerning all the Matters contained therein.

2.
If either of the Parties shall be at War with any Nation whatever, the other Party shall not take a Commission from the Enemy nor fight under their Colors.

3.
If either of the Parties shall be at War with any Nation whatever and take a Prize belonging to that Nation, and there shall be found on board Subjects or Effects belonging to either of the Parties, the Subjects shall be set at Liberty and the Effects returned to the Owners. And if any Goods belonging to any Nation, with whom either of the Parties shall be at War, shall be loaded on Vessels belonging to the other Party, they shall pass free and unmolested without any attempt being made to take or detain them.

4.
A Signal or Pass shall be given to all Vessels belonging to both Parties, by which they are to be known when they meet at Sea, and if the Commander of a Ship of War of either Party shall have other Ships under his Convoy, the Declaration of the Commander shall alone be sufficient to exempt any of them from examination.

5.
If either of the Parties shall be at War, and shall meet a Vessel at Sea, belonging to the other, it is agreed that if an examination is to be made, it shall be done by sending a Boat with two or three Men only, and if any Gun shall be Bred and injury done without Reason, the offending Party shall make good all damages.

6.
If any Moor shall bring Citizens of the United States or their Effects to His Majesty, the Citizens shall immediately be set at Liberty and the Effects restored, and in like Manner, if any Moor not a Subject of these Dominions shall make Prize of any of the Citizens of America or their Effects and bring them into any of the Ports of His Majesty, they shall be immediately released, as they will then be considered as under His Majesty's Protection.

7.
If any Vessel of either Party shall put into a Port of the other and have occasion for Provisions or other Supplies, they shall be furnished without any interruption or molestation.

8.
If any Vessel of the United States shall meet with a Disaster at Sea and put into one of our Ports to repair, she shall be at Liberty to land and reload her cargo, without paying any Duty whatever.

9.
If any Vessel of the United States shall be cast on Shore on any Part of our Coasts, she shall remain at the disposition of the Owners and no one shall attempt going near her without their Approbation, as she is then considered particularly under our Protection; and if any Vessel of the United States shall be forced to put into our Ports, by Stress of weather or otherwise, she shall not be compelled to land her Cargo, but shall remain in tranquillity untill the Commander shall think proper to proceed on his Voyage.

10.
If any Vessel of either of the Parties shall have an engagement with a Vessel belonging to any of the Christian Powers within gunshot of the Forts of the other, the Vessel so engaged shall be defended and protected as much as possible untill she is in safety; And if any American Vessel shall be cast on shore on the Coast of Wadnoon (1) or any coast thereabout, the People belonging to her shall be protected, and assisted untill by the help of God, they shall be sent to their Country.

11.
If we shall be at War with any Christian Power and any of our Vessels sail from the Ports of the United States, no Vessel belonging to the enemy shall follow untill twenty four hours after the Departure of our Vessels; and the same Regulation shall be observed towards the American Vessels sailing from our Ports.-be their enemies Moors or Christians.

12.
If any Ship of War belonging to the United States shall put into any of our Ports, she shall not be examined on any Pretence whatever, even though she should have fugitive Slaves on Board, nor shall the Governor or Commander of the Place compel them to be brought on Shore on any pretext, nor require any payment for them.

13.
If a Ship of War of either Party shall put into a Port of the other and salute, it shall be returned from the Fort, with an equal Number of Guns, not with more or less.

14.
The Commerce with the United States shall be on the same footing as is the Commerce with Spain or as that with the most favored Nation for the time being and their Citizens shall be respected and esteemed and have full Liberty to pass and repass our Country and Sea Ports whenever they please without interruption.

15.
Merchants of both Countries shall employ only such interpreters, & such other Persons to assist them in their Business, as they shall think proper. No Commander of a Vessel shall transport his Cargo on board another Vessel, he shall not be detained in Port, longer than he may think proper, and all persons employed in loading or unloading Goods or in any other Labor whatever, shall be paid at the Customary rates, not more and not less.

16.
In case of a War between the Parties, the Prisoners are not to be made Slaves, but to be exchanged one for another, Captain for Captain, Officer for Officer and one private Man for another; and if there shall prove a deficiency on either side, it shall be made up by the payment of one hundred Mexican Dollars for each Person wanting; And it is agreed that all Prisoners shall be exchanged in twelve Months from the Time of their being taken, and that this

exchange may be effected by a Merchant or any other Person authorized by either of the Parties.

**17.**
Merchants shall not be compelled to buy or Sell any kind of Goods but such as they shall think proper; and may buy and sell all sorts of Merchandise but such as are prohibited to the other Christian Nations.

**18.**
All goods shall be weighed and examined before they are sent on board, and to avoid all detention of Vessels, no examination shall afterwards be made, unless it shall first be proved, that contraband Goods have been sent on board, in which Case the Persons who took the contraband Goods on board shall be punished according to the Usage and Custom of the Country and no other Person whatever shall be injured, nor shall the Ship or Cargo incur any Penalty or damage whatever.

**19.**
No vessel shall be detained in Port on any presence whatever, nor be obliged to take on board any Article without the consent of the Commander, who shall be at full Liberty to agree for the Freight of any Goods he takes on board.

**20.**
If any of the Citizens of the United States, or any Persons under their Protection, shall have any disputes with each other, the Consul shall decide between the Parties and whenever the Consul shall require any Aid or Assistance from our Government to enforce his decisions it shall be immediately granted to him.

**21.**
If a Citizen of the United States should kill or wound a Moor, or on the contrary if a Moor shall kill or wound a Citizen of the United States, the Law of the Country shall take place and equal Justice shall be rendered, the Consul assisting at the Tryal, and if any Delinquent shall make his escape, the Consul shall not be answerable for him in any manner whatever.

**22.**
If an American Citizen shall die in our Country and no Will shall appear, the Consul shall take possession of his Effects, and if there shall be no Consul, the Effects shall be deposited in the hands of some Person worthy of Trust, untill the Party shall appear who has a Right to demand them, but if the Heir to the Person deceased be present, the Property shall be delivered to him without interruption; and if a Will shall appear, the Property shall descend agreeable to that Will, as soon as the Consul shall declare the Validity thereof.

**23.**
The Consuls of the United States of America shall reside in any Sea Port of our Dominions that they shall think proper; And they shall be respected and enjoy all the Privileges which the Consuls of any other Nation enjoy, and if any of the Citizens of the United States shall contract any Debts or engagements, the Consul shall not be in any Manner accountable for them, unless he shall have given a Promise in writing for the payment or fulfilling thereof, without which promise in Writing no Application to him for any redress shall be made.

**24.**
If any differences shall arise by either Party infringing on any of the Articles of this Treaty, Peace and Harmony shall remain notwithstanding in the fullest force, untill a friendly Application shall be made for an Arrangement, and untill that Application shall be rejected, no appeal shall be made to Arms. And if a War shall break out between the Parties, Nine Months shall be granted to all the Subjects of both Parties, to dispose of their Effects and retire with their Property. And it is further declared that whatever indulgences in Trade or otherwise shall be granted to any of the Christian Powers, the Citizens of the United States shall be equally entitled to them.

**25.**
This Treaty shall continue in full Force, with the help of God for Fifty Years.

We have delivered this Book into the Hands of the before-mentioned Thomas Barclay on the first day of the blessed Month of Ramadan, in the Year One thousand two hundred.

I certify that the annex'd is a true Copy of the Translation made by Issac Cardoza Nunez, Interpreter at Morocco, of the treaty between the Emperor of Morocco and the United States of America.

THOS BARCLAY